UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | 19 CR 664 (VB) |
| - v. - | : | |
| BARBARA MEYZEN, | : | |
| Defendant. | : | |

-----------------------------------------------------------------X

# SENTENCING MEMORANDUM ON BEHALF OF
# DEFENDANT BARBARA MEYZEN

JAMES R. DEVITA, ESQ.
LAW OFFICES OF JAMES R. DEVITA, PLLC
81 Main Street, Suite 504
White Plains, New York 10601
Phone (914) 328-5000

*Attorney for Defendant Barbara Meyzen*

**Introduction**

Barbara Meyzen, by and through her counsel, submits this memorandum to assist the Court in determining a just sentence in this case. Ms. Meyzen pled guilty to a Superseding Information charging one count of wire fraud   The fraud to which she admitted, however, was multifaceted – involving lenders and potential lenders to La Cremaillere, the family owned restaurant she and her husband ran, customers of the restaurant whose credit cards she wrongfully used, and even the Bankruptcy Court. In addition, when first questioned about her wrongful conduct by the FBI, Ms. Meyzen lied. These serious crimes, however, were not the product of greed. They were the product of desperation and serious psychological problems, attributable to enormous pressure she was under as a result of responsibility that was thrust upon her that she was totally unequipped to handle. Moreover, her lies to the FBI – which were completely transparent and easily refuted – were the result of a panic reaction related to the overwhelming business and family responsibilities and pressures she was facing at the time.

Without proper training or experience, Ms. Meyzen was put in complete charge of the business and financial affairs of this high-end restaurant, while her husband ran the "front of the house." When the financial condition of the restaurant deteriorated and rapidly became desperate, she attempted to save the business and the jobs of its numerous employees with misguided and admittedly deceptive steps – but always with the hope and belief that the lenders and deceived customers would be made whole and repaid in full when the business turned around. Her severe depression hid the truth from her – that the restaurant was never going to be sufficiently profitable for her to do that.

In the meantime, she could not share the weight of this pressure with her husband because of his serious illness, which required multiple hospitalizations, delicate surgery and

- 1 -

lengthy recovery, such that the stress she was bearing on her own might have had serious adverse consequences if she shared it with him. Adding to all of this pressure was the fact that Ms. Meyzen was the primary caregiver to her aged, infirm and increasingly declining mother in law, who suffered from severe dementia. None of this excuses her criminal conduct, but it provides background and context which helps explain her aberrational conduct – which contrasts starkly to exemplary life she led prior to her lapse into the crime to which she has pled guilty.

The numerous letters from friends and family attached as Exhibits D, E, F and G attest to the high moral character, kindness and generosity of Barbara Meyzen. The story those letters tell is remarkably moving, and the picture they paint is of a truly wonderful person. Her life, however, has not been easy. The daughter of an alcoholic father, she is herself a recovering alcoholic who has managed to remain sober for 30 years. In fact, she met her husband, Robert, in a recovery program. Depression is often associated with alcoholism, and the genetic predisposition to both are present in this case. Not only was Ms. Meyzen's father an alcoholic, her mother suffered from severe depression. The report of Dr. Richard B. Krueger, a psychiatrist who examined Ms. Meyzen and whose report is attached as Exhibit A, explains that at the time of the crimes to which she has pled guilty, Ms. Meyzen was suffering from major depression that seriously affected her judgment and ability to appreciate the significance of her conduct. Dr. Kreuger's diagnosis is supported by Dr. Stephanie Schacher, a clinical psychologist who has been treating Ms. Meyzen as recommended by Dr. Krueger and whose letter is attached as Exhibit B, and by Gail Faithful, Ms. Meyzen's retired former pastor and therapist, whose letter to the Court is attached as Exhibit C .

Another constant theme that runs through the letters of support, Dr. Kreuger's report and the Probation Office's Presentence Investigation Report ("PSR") is the frankness and openness

with which she has admitted the extent of her conduct and the sincere and deep remorse Ms. Meyzen has expressed regarding it. That also is clearly reflected in her own moving and genuine letter to the Court, which is attached as Exhibit H. In it she accepts responsibility for her conduct fully and completely, nevertheless seeking to explain the factors that led her down a path that is completely inconsistent with the person she was for the first fifty some years of her life, and who she has returned to being. It is also clear, from the testament of those who know her best and from Dr. Krueger's professional assessment, that the likelihood of Ms. Meyzen committing any future crimes is simply non-existent.

Although the Probation Office recommends a variance from the extremely high guideline range, the four-year sentence recommended in the PSR is still excessive. In light of the many mitigating factors discussed in more detail in this memorandum, and Ms. Meyzen's extreme vulnerability to danger in a prison setting because of her diminutive size and gentle nature (*see United States v. Lara,* 905 F.2d 599 (2d Cir. 1990); *United States v. Harris,* 349 F. Supp.3d 221 (E.D.N.Y. 2018) (Weinstein, D.J.)), I respectfully submit that any sentence of imprisonment would be unjust, even tragic. Although home confinement might be considered, it would also impede Ms. Meyzen's ability to continue her current employment and her significant good work in the community, particularly her participation in the Pegasus Therapeutic Riding Program, a program that provides equine-assisted activities to people with special needs and individuals at risk, including disadvantaged youth, trauma survivors and adults with developmental disabilities. *See pegasustr.org*. An appropriate sentence, in which justice and mercy were combined, would be a period of probation with an extensive community service component.

**Applicable Guideline Range and Probation Office Recommended Sentence**

Ms. Meyzen's plea agreement with the government contains a guideline stipulation, with which the Probation Office agrees. PSR ¶¶ 4, 42-55, 110-111. The base offense level for wire fraud is seven; upward adjustments for intended loss, number of victims, misrepresentation in connection with a bankruptcy proceeding, use of sophisticated means, and obstruction of justice, and downward adjustment of three levels for acceptance of responsibility, result in a total offense level of 28. PSR ¶¶ 43-55. Ms. Meyzen's criminal history score is zero, so she is in criminal history category I. PSR ¶ 58. The resulting recommended guideline sentencing range is 78 to 97 months. PSR ¶ 110.

The Probation Office recommends a downward variance from the guideline range to a sentence of 48 months. PSR at 28. The PSR "recognize[s] that the harm caused by the instant offense is overstated by the guideline range which accounts for the intended loss and not the actual loss." PSR at 29. This is so because Ms. Meyzen was unsuccessful in obtaining several of the loans for which she applied making the misrepresentations recited in the Superseding Information. The PSR also appears to accept Ms. Meyzen's explanation that "she was under a considerable amount of stress during the instant offense which negatively impacted her judgment" and concludes from her level of education, "history of gainful employment" and "complian[ce] with the conditions of pretrial supervision" that "her risk of recidivism would appear to be low." *Id.*

The Probation Office nevertheless concludes that "a custodial term is warranted to address the sentencing objectives of just punishment and general deterrence." *Id.* For the reasons discussed in this memorandum, I respectfully submit that incarcerating this 59 year old

for her first real offense would be the opposite of "just punishment," irrespective of whatever "general deterrence" it might generate. Furthermore, it would undermine the very progress the PSR commends in "obtain[ing] new means to financially provide for herself" with "part-time retail work" and as "an independent contractor for a title search company." *Id.* Given the likely demise of her marriage, *see* PSR ¶ 77, Ms. Meyzen's ability to support herself is essential her continued recovery and future life. The prospects for her being able to resume that progress at age 63, after completion of a four-year sentence, seem rather dismal.

### Statement of Facts

Barbara Meyzen ("Bobbie") met her husband, Robert Meyzen ("Robert"), in 1989 at an alcohol rehabilitation program called High Watch Farm in Kent, Connecticut. They were married on September 11, 1991. PSR ¶ 70. Bobbie supported herself and her new husband for the first two years of their marriage, working in her own title searching business and as a "product adviser" at Lord & Taylor. Robert was not working, so her income paid for his child support for his two children from two prior marriages, as well as their school tuition, medical and dental expenses. In addition, six months after they were married, Robert's mother divorced his father and moved in with Robert and Bobbie.

At the time they were married, Robert's father owned a restaurant called La Cremaillere located in Bedford, New York, which opened in 1947 and which Robert's father purchased in 1961. Robert worked in the family restaurant from 1974 until just before he and Bobbie were married in 1991. In 1993, Robert and Bobbie purchased the restaurant from Robert's father. Initially, Bobbie continued her title searching business because the income from La Cremaillere was less than expected. She nevertheless worked in the restaurant as well. Robert delegated to Bobbie all responsibility for the business and financial aspects of the restaurant, concentrating

himself on the food, wine and service aspects. Bobbie worked ten hours a day, six or seven days a week, including holidays, to keep the business going.

Over the years, the restaurant went through lean periods. In 2005, Robert and Bobbie borrowed money from both Bobbie's mother and father, who were divorced. In 2013, they borrowed $ 155,000 from Bobbie's aunt, Judy Smith, and that loan was secured by a second mortgage on the restaurant property. It was that mortgage that is the subject of one aspect of the fraud to which Bobbie has admitted.

The financial circumstances of the restaurant became particularly dire starting in 2015, and Bobbie was desperate to obtain financing to keep it afloat. In addition to falsifying documents submitted to prospective lenders in order to make the financial condition of the restaurant look better than reality, in November and December of 2015 she also forged a false satisfaction of the mortgage securing the loan from Aunt Judy. Bobbie had been told that in order to obtain a refinancing needed to save the restaurant, the second mortgage would have to be satisfied. Since she knew they didn't have the funds to repay her aunt's loan, Bobbie resorted to fraud – always hoping that the restaurant would recover and that everyone would be paid. In the summer of 2017, and again in May and June 2019, Bobbie used the credit card numbers of two different customers, kept on file to pay for their meals at the restaurant, to pay bills of the restaurant – again with the hope and intention of repaying them.

These financial difficulties coincided with two family health crises that Bobbie had to handle almost on her own. Robert suffered from a condition called "Hiroshima" syndrome, stemming from radiation exposure he had experienced in connection with treatment for a tumor as a child. It was discovered when he suffered repeated urinary tract infections, which required multiple hospitalizations during the years between 2017 and 2019. *See* Ex. A at 5. Bobbie was

often asked to stay overnight at the hospital with Robert, and then had to spend much of the day at the restaurant without him.  It turned out that the childhood radiation treatment had caused damage to his internal organs, and that the infections were the result of that damage.  In February of 2019, he underwent surgery to separate his bladder from his colon and spent that entire month in the hospital.  *Id.*  Upon his release, the aftercare required daily hyperbaric treatments in the hospital, as well as daily wound care after those treatments.  Bobbie was solely responsible to get him back and forth to those appointments, and for keeping the restaurant running in between.  Robert was unable to work from Thanksgiving 2018 until June 2019.

       The second family health crisis related to Robert's mother, Marie.  Beginning in 2015, she developed dementia, and became increasingly difficult to handle.  Bobbie was her primary caregiver, providing support with her daily tasks and her emotional care, particularly during Robert's various hospitalizations.  While they employed the services of health care aids, the degree of difficulty in taking care of Marie caused frequent turnover.  This continued through December 2019, when it ultimately became necessary to institutionalize Marie.

       In September of 2018, Meyzen Family Realty, LLC, which owned the real property where the restaurant operated, filed for protection under Chapter 11 of the United States Bankruptcy Code.  In April 2019, La Cremaillere Restaurant Corp., which operated the restaurant, filed under Chapter 11 as well.  Because of Robert's condition, and the potential damage the stress would cause, Bobbie did not even inform him of the bankruptcy filings and tried to manage those without his assistance.  In connection with those proceedings, Bobbie misled the Assistant United States Trustee regarding the status of property and liability insurance coverage on the property – in part because she hoped she could reinstate the insurance after defaulting on the payment of premiums.

Shortly after La Cremaillere Restaurant Corp. filed for bankruptcy protection, Bobbie also caused deposits of more than $40,000 in restaurant receipts that belonged to the bankruptcy estate to be deposited into an account in her own name, and then opened an account in the name of an entity she controlled called Honey Bee Farm LLC, and caused another $ 380,000 of restaurant receipts to be deposited to that account.  These accounts were utilized, however, because after the bankruptcy filing for the restaurant company, Bobbie was having difficulty with the banks that handled the La Cremaillere accounts; she felt overwhelmed by the bureaucratic difficulty of dealing with the banks.  At least one account was closed by the bank, even thought it had been designated a "debtor in possession" account.  Bobbie intended to, and did, use most of the funds to pay restaurant related expenses, including employee payroll and suppliers' bills.  Some of the funds were also used to pay for the health care aids for Marie.

On May 1, 2019, Special Agents of the FBI approached Bobbie in the parking lot of the restaurant to question her about the various fraudulent activities described in the Superseding Information.  She panicked and lied.  She had just returned from a trip to the hospital with Robert for his hyperbaric treatment, stopping at the restaurant to take care of business before picking Robert up from the hospital again and heading home to attend to his wound treatment and to take care of her mother in law.  Bobbie was afraid that if she told the truth and admitted her wrongdoing, she might be arrested – or would at least be detained for a long period to answer more questions – and would then be unable to attend to those responsibilities.  This was obviously a woeful error in judgment, not only because it was wrong to lie, but because her lies were readily disprovable and could not possibly hold up under scrutiny.  However, Bobbie was suffering from a serious psychological condition – major depression – that distorted her judgment and led her to choices totally inconsistent with her basic honest character.  It was not

long after that interview that the agents returned with an arrest warrant for Bobbie.

## Ms. Meyzen's Own Medical Condition

Shortly after I was assigned to represent Ms. Meyzen, she made a startling statement. She told me, in an almost matter of fact observation, that during the period of time she engaged in the conduct that led to her arrest, starting in 2015, she made a habit of bringing her dog with her when she was driving anywhere because then "I knew I wouldn't drive off a bridge." It struck me as highly significant that she had more concern for her dog's life than her own. I therefore sought medical confirmation of my suspicion that Ms. Meyzen suffered from significant depression.

Ms. Meyzen was examined by Dr. Richard B. Krueger, who in addition to his private practice is a Clinical Professor of Psychiatry at Columbia University's College of Physicians & Surgeons. Dr. Krueger is a Diplomate in Psychiatry, as certified by the American Board of Psychiatry & Neurology, with Added Qualifications in Forensic Psychiatry. Ex. A at 1. (A copy of Dr. Krueger's *curriculum vitae* is included in Exhibit A). Dr. Kreuger interviewed Ms. Meyzen for a total of more than five hours, over three different occasions. Ex. A 1-2. He administered a series of tests to screen for psychiatric Syndromes, including: Structured Clinical Interview for DSM-IV and DSM-IV-TR Axis I Disorders; The Beck Depression Inventory, an instrument used to assess the degree of depressive symptomology an individual has; a Mini-Mental Status Examination to screen for cognitive disorders; the Washton Alcohol and Drug Use Questionnaire; the Michigan Alcohol Screening Test; the Drug Abuse Screening Test; the Adverse Childhood Experiences Scale; the Hare Psychopathy Checklist, Full Version; an SCID-II used to make diagnoses for various personality disorders; the Rotter Incomplete Sentences Blank, which is a well-studied projective instrument; and the Level of Service/Case Management

Inventory (LS/CMI), an offender assessment used to assess an offender's needs and risks.  Ex. A at 6-7.  In addition, Dr. Krueger interviewed Dr. Richard Huntley, Ms. Meyzen's primary care physician, and Gail Faithful, Ms. Meyzen's former therapist and minister, who is now retired.

Dr. Krueger diagnosed Ms. Meyzen as suffering a "Major depressive disorder, with recurrent episodes, severe, in partial remission." Ex. A at 9.  She also suffers from "Alcohol use disorder, severe, in sustained remission." *Id.*  In addition, Ms. Meyzen's testing on the SCID-II met the criteria for obsessive-compulsive disorder, but Dr. Krueger's did not make a formal personality disorder diagnosis.  Ex. A at 7.  This test result, however, helps explain the obsessive nature of Ms. Meyzen's handling of the financial affairs of La Cremaillere.

According to Dr. Krueger, Ms. Meyzen "has a history of recurrent major depression and the most recent episode began in approximately 2015 and this was associated with her illegal activities." Ex. A at 9.  In their interview, Ms. Meyzen admitted to "suicidal ideation" "since her arrest and in the past when she was depressed," but "had never acted on this." Ex. A at 8.  Dr. Krueger rendered the following opinion and recommendation:

> Ms. Meyzen has a childhood characterized by a father who was an alcoholic and a mother who was depressed.  Ms. Meyzen herself developed severe alcohol use disorder and recurrent depressive disorders.  She has a history of being an extremely hard worker, sometimes investing up to 100 hours per week in her work efforts.  While she was struggling to keep the restaurant solvent, she became progressively depressed and, in this context, engaged in various financial crimes.  She remains significantly depressed.  Despite these stressors, she has a remarkably history of sobriety, which has endured for 32 years.
>
> Despite this recent criminal history, Ms. Meyzen's risk of re-offense is low as assessed by the Level of Service/Case Management Inventory and the Hare Psychopathy Checklist, both validated instruments to asses this risk.  Ms. Meyzen has learned from the educative effects of her arrest and the legal system and in my opinion is at remote risk of re-offense.  She should have an evaluation and treatment for her current depression, which is significant, and has agreed to do this.  I do not think that she is at significant risk to suicide at this juncture.

*Id.*  At Dr. Kreuger's suggestion, Ms. Meyzen pursued meeting with her retired therapist, Gail

Faithful, and began seeing a psychologist, Dr. Stephanie Schacher. Dr. Krueger, on the basis of a June 5, 2020 interview, saw significant improvement in her condition. Ex. A at 8.

Dr. Schacher, whose *curriculum vitae* is included in Exhibit B, describes Ms. Meyzen as "the overly responsible person, the workaholic, the over-achiever, who pulls not only her weight, but the wight of others." Ex. B at 2. Furthermore, according to Dr. Schacher:

> Bobbie measures her self-worth by how much she can be of service to others. And often being of service to others has meant being used and manipulated by others. For most of her life, the only way Bobbie knew how to be intimately attached to others, and to love and feel loved by others was to be of service to them, to take care of their needs no matter the cost. This trait is what has led her down the path to fraud. Rather than disappoint her husband, rather than admit to him that she could not "find a way", per his dictates, to keep the restaurant afloat, she chose to commit fraud.
>
> What is important to know here is that the intent of Bobbie's actions was not to cheat someone to profit personally. It was to use shady means to save the restaurant, and keep herself in her husband's good graces and be of value in his eyes. Her intent was to stabilize things financially, keep the restaurant's payroll and vendor obligations, and then make good on the monies she owed to others.

*Id.*

Dr. Schacher's assessment of the psychological dynamic that led to Ms. Meyzen's criminal conduct is echoed by Gail Faithful, who has known Ms. Meyzen for most of her life, first as a minister at New Canaan Presbyterian Church where Ms. Meyzen attended with her family as a youngster, then as her therapist when Ms. Faithful became a pastoral psychotherapist. Ex. C at 1. In her letter to the Court, Ms. Faithful describes "the REAL Bobbie" as "primarily a joyful sprite, energetic, playful, gracious, smart, funny and a hard, dependable and serious worker." *Id.* According to Ms. Faithful, Ms. Meyzen "is loyal, indeed too loyal in her husband's case." *Id.*

When interviewed by the Probation Office, Ms. Faithful explained that Ms. Meyzen "'was under a lot of pressure' from her husband to obtain the financial means to continue operating the restaurant," that Robert was "emotionally abusive," and Ms. Meyzen "'didn't have adequate

- 11 -

boundaries to say no' to him." PSR ¶ 82.  In her letter to the Court, Ms. Faithful says that "over a long period Robert put heavy pressure on [Ms. Meyzen] to borrow money from every one they knew."  Ex. C at 2.  Perceptively, she makes the following observation: "What mystifies me is why she was put in charge of the business side of the effort, when she had no training or experience in finance."  *Id.*  In view of the role his pressure and emotional abuse played in Ms. Meyzen's behavior, and the role she played in catering to his every need when he was ill and taking care of his mother through her lengthy decline, it is sadly ironic that Robert apparently blames Bobbie for the restaurant closing – when, in fact, her misconduct appears to have kept it open longer than it would have staid otherwise – and appears poised to end their marriage.  PSR ¶¶ 77, 82.

## Legal Analysis

As Your Honor is fully aware, the Federal Sentencing Guidelines are only advisory and the Court has broad discretion under the applicable law to vary downward from the guideline range after considering the sentencing factors set forth in 18 U.S.C. § 3553(a). *United States v. Booker,* 543 U.S. 220 (2005); *Kimbrough v. United States,* 552 U.S. 85 (2007). *Gall v. United States*, 552 U.S. 38 (2007). Nevertheless, the Court must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Gall, supra,* 552 U.S. at 49.  In this case, a non incarceratory sentence would be "sufficient, but not greater than necessary, to comply with the purposes set forth in" § 3553(a).

The first two considerations listed in § 3553(a) are "the nature and circumstances of the offense and the history and characteristics of the defendant."  § 3553(a)(1).  Here, while Ms. Meyzen has pled guilty to a serious, multifaceted financial fraud, it is worth emphasizing that she was not motivated by greed or personal profit.  Rather, she was seeking desperately to keep the restaurant that had been in her husband's family for fifty odd years from failing.  The pressure she was under, and the effect her psychological handicaps had on her judgment, distinguish this case from many, if not

- 12 -

most, fraud cases considered under the guidelines.

Perhaps even more significant are Ms. Meyzen's individual history and characteristics. The many letters to the Court in support of Ms. Meyzen attest to the fact that Ms. Meyzen is truly an extraordinary person. For example, Betsy Stein Medinger, the former program director for the Pegasus Therapeutic Riding Program, describes Ms. Meyzen's twenty-year involvement in that program as a volunteer – "[h]er patient and understanding way with our special needs students allowed them to learn with confidence and work towards their goals to become as independent as possible." Exhibit D. Ms. Meyzen volunteered not only her time, but her horses as well – horses she acquired through rescue, saving them from the proverbial glue factory and nurturing them, too. Ms. Meyzen recently completed a certification program that will enable her to become a Therapeutic Riding Instructor, which will enable her to become an even more valuable asset to the Pegasus program. *See* PSR ¶ 99.

Another activity that reflects Ms. Meyzen's essential character is her involvement in the Backyard Beekeepers Association. At first blush, that may seem a rather esoteric pursuit with little evidence to offer in terms of her character. However, as Sister Ozanne Schumann, a Benedictine nun who met Ms. Meyzen through the Backyard Beekeepers Association, explains "*it's not really about the bees*. Her work with the club, her teaching and mentoring and support of beekeepers and want-to-be beekeepers is driven in the purest sense by her desire to share something she loves for the life-changing gift it can be to others." Exhibit E. Sister Ozanne acknowledges that Ms. Meyzen's "ardor to help her family and friends and her creativity in finding ways to do it" represent a "double-edged sword, with which she cut a sad path to her current predicament," but prefers to explore the "utter tenacity of her drive to help people." *Id.* As she explains:

> I have known this in many ways over the course of our relationship, with her generosity extended to so very many. What is singular about it – increasingly – is the way that she takes her obstacles, troubles, or setbacks and tries to find in them something she can offer to help others.

*Id.*

Perhaps the most moving, insightful and perceptive letter is from Ms. Meyzen's stepdaughter, Marissa Meyzen, a copy of which is attached as Exhibit F. Marissa was six years old when Bobbie came into her life upon her marriage to Marrissa's father, Robert. Marissa explains that:

> Over the last thirty years, [Bobbie] has become more than just a stepmom, she is a best friend, a mentor, and a trusted confidant. Throughout my adolescence years, my teenage angst, and the struggles to find my path as a young adult, Bobbie has consistently been by my side. I am thankful for the opportunity to be able to attest to her character as I have been the beneficiary of her loving kindness for as long as I can remember.

Ex. F at 1. Marissa goes on to explain the many ways in which Bobbie has demonstrated her selflessness, kindness and generosity over those thirty years. One incident in particular provides tremendous insight into Bobbie's motivation for the conduct to which she has pled guilty:

> Many years ago, I asked her why she and my father didn't just get rid of the restaurant, to me, it was such a stressful and all-consuming endeavor. Her response was so unexpected that it has stuck with me ever since. She asked, "What would the family do?". You may imagine that she was referring to the "Meyzen Family" but she was speaking of the men and women who were the lifeblood of the restaurant, the restaurant family, the line cooks, the bus-boys, the dishwashers, the waiters. She followed with another question "What would they do without their next paycheck?". She reminded me that some of these people were new Americans, just starting out, trying to provide for their family. This unexpected response opened my eyes to the enormity of responsibility Bobbie carried on her shoulders towards the people in her life.

*Id.* at 3. This conversation from many years ago confirms that Bobbie was not motivated by greed or desire for personal enrichment when, through the fog of her depression, she committed the fraud that she has now admitted. It confirms the genuineness of her statement to the interviewing Probation Officer that "she committed the instant offense so that the restaurant could remain open and that she did so for the sake of her husband as well as their employees," and that she "has . . . experienced a sense of relief since her instant arrest in part because she is no longer responsible for ensuring that the restaurant continues to operate." PSR at 29. That sense of relief from the overwhelming pressure she was under is reflected in the improvement of her mental state observed by Dr. Krueger in his most recent interview of her. Ex. A at 8.

These are only three examples of the many supportive letters to the Court from friends and

- 14 -

family, the balance of which are included as Exhibit G.  There are simply too many beautiful and loving letters to discuss each individually, but each one is worth reading because each provides, from a slightly different perspective, a clear picture of a truly wonderful person.  The constantly recurring theme is that Ms. Meyzen is a kind, caring and generous person who is always willing to help others.  Another recurring theme is how inconsistent with the real "Bobbie" the conduct for which she is convicted is.  Her honesty and integrity shine through in the many letters written on her behalf.  Also reflected in the many letters – and in the PSR – is the deep remorse that Ms. Meyzen feels regarding her offense conduct.  *See* PSR at 29..

The most direct evidence of Ms. Meyzen's remorse, however, is her own letter to the Court, which she begins by "saying that I am so very sorry, I am incredibly ashamed and remorseful about what I have done that has gotten me here."  Ex. H at 1.  She continues that "I will be sorry for the rest of my life that I compromised my principals [sic].  I also realize that compromising my principles, making errors, trying to correct them, not telling the truth, was not the answer to any of the problems that my husband and I had at our business."  *Id.* at 2.  Drawing on her thirty years of Alcoholics Anonymous experience, she explains that "I have to accept the things about my life that I cannot change.  I must have the courage to move through this process so that I can make amends and restitution for the harm I have done."  *Id.*  Ms. Meyzen gives the Court her "promise and pledge" that in the future she "will not behave in any deceitful or untrustworthy ways."  *Id.*  Professing belief that she is a "good person," she nevertheless recognizes that she must "continue to confront things about [herself] and [her] misconduct.  This is part of my tapestry now that I have to be humble and truthful and accepting of."  *Id.*  In sum, Ms. Meyzen humbly accepts responsibility for her conduct, is truly and deeply remorseful, and will never repeat the kind of conduct that brings her here – she pledges "to live in a manner that is nothing short of stellar, and take full responsibility."  *Id.*

Finally, another aspect of the "characteristics of the defendant" case that the Court needs to take into account in fashioning an appropriate sentence is Ms. Meyzen's extreme vulnerability were

she to be incarcerated.  In addition to being kind and gentle, Ms. Meyzen is tiny – five feet tall and 105 pounds.  PSR ¶ 78.  Even before *Booker* the Second Circuit held that "extreme vulnerability" and "potential for victimization" in prison were legitimate sentencing considerations under § 3553.  *United States v. Lara, supra,* 905 F.2d at 601-03.  Those considerations are present in this case.

In a case quite similar to this one, *United States v. Harris, supra,* Judge Weinstein of the Eastern District of New York imposed a sentence significantly below the applicable guideline range because the defendant "was likely to be in danger from some inmates" and "ha[d] a better chance at rehabilitation on the outside than on the inside of a prison."  349 F. Supp.3d at 223-24.  As here, the defendant pled guilty to a multifaceted fraud, including creation and forgery of documents to carry out the fraud and misrepresentations to a bankruptcy trustee.  *Id.* at 224-26.  The defendant's obstruction of the investigation in *Harris*, however, was far more extensive than Ms. Meyzen's transparent lies to the investigating agents.  It involved witness tampering, including instructing witnesses to lie and submit false documents.  *Id.* at 225-26.

In the *Harris* case, Judge Weinstein felt it necessary to impose a sentence of six months because "a sentence of no incarceration might send the wrong message to the community" since that the defendant was a member of the New York State Assembly when she committed the crimes: "Government officials have an obligation to demonstrate high ethical conduct.  If we are to survive as a democracy under the rule of law, people must retain faith in the honesty of their representatives." *Id.* at 224.  Here, no similar consideration makes a sentence of incarceration "necessary."

None of the other sentencing considerations set out in § 3553(a)(2) make a sentence of incarceration "necessary" in this case.  A sentence of significant probation and community service will adequately reflect the seriousness of this non-violent offense, and will "promote respect for the law" and "provide just punishment" sufficiently in light of all the mitigating circumstances present in this case.  § 3553(a)(2)(A).  The Probation Office recognizes (PSR at 29) and the submissions attached to the memorandum, including Dr. Krueger's report and the many letters, demonstrate that

Ms. Meyzen is most unlikely to reoffend.  Thus, specific deterrence does not require a jail sentence and the public does not need to be protected from further crimes on her part. § 3553(a)(2)(B) and (C). While general deterrence is a relevant consideration, jailing a 59 year old, first time offender who committed her non-violent offense while in the grip of major depression – for the sake of "sending a message" – would be excessive.  Finally, no need for educational or vocational training or other correctional treatment would be furthered by incarcerating Ms. Meyzen.  § 3553(a)(2)(D).  In fact, as the probation report points out, Ms. Meyzen has been able to obtain not one, but two jobs since separating from *La Cremaillere* – as a sales associate in a retail saddlery shop, and as a title searcher, an occupation she pursued before becoming totally engrossed in her husband's family restaurant. PSR ¶¶ 101-02.  The letter to the Court from her employer in the title searching business, Jacqueline Purcell of Fusion Title Search, explains what a valuable asset Ms. Meyzen has become to her business, and the frankness and honesty she demonstrated in explaining her legal difficulties to her prospective employer.  *See* Ex. H.  Incarcerating Ms. Meyzen would clearly impede the progress she has already made in fashioning a productive and law abiding future.

## Conclusion

On the basis of the foregoing, we respectfully request that defendant Barbara Meyzen be sentenced to a term of probation, with a condition of significant community service.

Dated:       White Plains, New York
             September 11, 2020

                                                          Respectfully Submitted,

                                                          /s/ James R. DeVita
                                                          **James R. DeVita (JRD 5659)**
                                                          81 Main Street, Suite 504
                                                          White Plains, NY 10601
                                                          (914) 328-5000

                                                          *Attorney for Defendant Barbara Meyzen*