UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                        :
UNITED STATES OF AMERICA                :
                                        :                19 Cr. 664 (VB)
            -v-                         :
                                        :
BARBARA MEYZEN, a/k/a                   :
    "Bobbie Meyzen,"                    :
                                        :
                Defendant.              :
                                        :
------------------------------------------------------X


### GOVERNMENT'S SENTENCING MEMORANDUM


AUDREY STRAUSS
Acting United States Attorney for the
    Southern District of New York


JAMES MCMAHON
Assistant United States Attorney

- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
                                   :

UNITED STATES OF AMERICA          :

                                     :                             19 Cr. 664 (VB)

              -v-                    :

                                       :

BARBARA MEYZEN, a/k/a          :
  "Bobbie Meyzen,"                   :

                                       :

                     Defendant.     :

                                       :
-----------------------------------------------------X

<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

      The Government respectfully submits this memorandum in connection with the sentencing of defendant Barbara Meyzen, now scheduled for September 23, 2020 at 3:00 PM. For the reasons discussed below, the Government respectfully submits a Guidelines sentence would be appropriate in this case.

I.     <u>The Offense Conduct</u>

      For nearly four years from August 2015 to July 2019, the defendant engaged in a multi-faceted scheme of fraud and obstruction in an effort to maintain control of the failing restaurant she owned with her husband.   The defendant went to extraordinary lengths to carry out her scheme, including subverting and obstructing the bankruptcy process, falsely accusing an innocent person of a crime she had committed, repeatedly defrauding lenders, filing false documents in county property records and more, all as described below.

     A.     <u>The Restaurant</u>

      The defendant and her husband jointly owned and operated La Cremaillere Restaurant in Banksville, New York.   The restaurant specialized in French cuisine and had operated in the

1

same location for seventy years.   It drew its clientele, including Andrew Cuomo, Tom Brokaw, Regis Philbin and Tommy Hilfiger, primarily from Westchester County and nearby Greenwich, Connecticut.   In 2017, Vanity Fair proclaimed the restaurant was "home to the finest French country cooking on the East Coast."   Witchel, Alex, *La Cremaillere is Home to the Finest French Cooking on the East Coast,* Vanity Fair, September 2017.

The defendant jointly owned La Cremaillere with her husband through two entities.   La Cremaillere Restaurant Corp., of which she was the Vice President, owned the restaurant business.   Meyzen Family Realty Associates, LLC, of which the defendant was a managing member, owned the real property from which the restaurant operated.   The defendant handled the restaurant's finances while her husband, whose father had started the restaurant, interacted with customers, selected the wines and supervised the preparation of the food.

The operation of the restaurant turned unprofitable starting in 2009 due to the recession, changing tastes and an aging clientele.   In September 2018, the defendant filed a Chapter 11 bankruptcy petition on behalf of Meyzen Family Realty and another Chapter 11 petition on behalf of La Cremaillere Restaurant in April 2019.   She reported in the restaurant's petition that the restaurant had approximately $1.3 million in assets and approximately $2 million in liabilities.

The restaurant closed in February 2020.   A trustee appointed by the Bankruptcy Court in July 2019 recently sold the restaurant property and the business for $1.5 million to an investor group that plans to reopen the restaurant, with the defendant's husband as its manager.   In addition to the $1.5 million from the restaurant sale, the trustee received a net $289,833 from his sale of the restaurant's wine collection.

The trustee reports that only the primary mortgagee and the bankruptcy professionals will

2

receive payments from these proceeds.   The other creditors will not recover anything.   These creditors include L&J Smith Investments, LP ("L&J Smith"), which held a $155,000 second mortgage on the restaurant property; the Internal Revenue Service, which had a claim of approximately $435,000; the New York State Department of Taxation and Finance, which had a claim of approximately $601,000; the New York Department of Labor, which had a claim of approximately $48,000; one of the defrauded lenders, which is still owed $44,000; and some of the restaurant's employees who claim they are due wages from the time when the defendant handled the restaurant's finances.

B.   The Scheme

1.   Defrauding Lenders

The defendant submitted false information as part of loan applications she made on behalf of the restaurant to eight different lenders from August 2015 through March 2018.   In each instance, the defendant gave the lenders checking account statements for the restaurant that she had altered to create the false appearance that the restaurant was profitable.   The defendant's alterations included converting negative balances for the beginning and end of months, as well as negative daily balances, to positive balances; removing references to checks drawn by her that were rejected due to insufficient funds; and reducing or removing service charges arising from checks she drew that were rejected due to insufficient funds.   These alterations were tedious work, as each monthly bank statement generally consisted of at least ten pages and the defendant would generally submit statements for several months to each lender.

The defendant sought more than $2 million in loans with these altered bank statements. She obtained a total of $328,000 in funding from five of the eight lenders, of which $44,000 in principal remains outstanding.

3

2.     <u>Posing as a Bank Officer</u>

When one of the lenders questioned the authenticity of the altered bank statements, the defendant went as far as to pose as a vice president of her bank so that she could reassure the lender that the statements were authentic.

In December 2015, the defendant was seeking a $300,000 loan for the restaurant and submitted altered bank statements in support of her application.   On December 7, 2015, La Cremaillere's loan broker sent the defendant an email in which he said in relevant part:

> I spoke with [the potential lender] and they are trying to get the same answers
> about the bank statements that we discussed a few weeks ago, hopefully you
> recall I mentioned that ultimately you may need to give access to the accounts.
> In this case [the potential lender] just needs your bank to explain and help cover
> the bases.   You also may recall two of my lenders had reviewed your file for
> 150k-300k loan and each expressed confusion over how the bank statements are
> presented and how the balances are calculated.   Please let me know what I can do
> to have you get with [the lender representative] at [telephone number] to get this
> completed.   It's important for you to know that we are a day away from docs and
> funding once this is resolved . . ..

Three days later, a representative of the lender asked an Assistant Vice President (the "Banker") of the restaurant's bank for copies of the restaurant's bank statements for the months of June through November 2015.   The Banker complied.   A few days later -- after it would have been apparent that the account statements provided by the Banker did not match those the defendant gave the lender -- the Banker sent the lender an email, with a copy to the defendant, stating that:

> Bobbie has given me permission to explain why a balance does not agree with the
> availability balance.
>
> The system at the Bank is "live" meaning when a deposit is made the balance will
> change and also the available balance.   The available balance could be lower due
> to the checks that were deposited have to clear [sic].   . . .
>
> When a check is cashed that is on this Bank, this will also change the balance.

4

> Cashing a non-on-us check for a client there will be a one day hold on their account making the available balance lower than the balance.

> The balance and available balance can change thru out [sic] the day.

The lender was not satisfied by that explanation because, as he explained in an email to the Banker, with a copy to the defendant, "[t]he statements given to us by you show nsf charges, but the ones given by Bobbie, which she states were given to her by the bank, do not have the nsf charges."

Five days later, the lender rejected the restaurant's application for credit "[b]ased on suspicion of fraud."   The next day, the lender received an email that purported to be from the Banker.   The "From" line in the email contained the Banker's name, immediately followed by "<[Name of Bank]@gmail.com>".   The email had the same subject line, "RE:   Meyzen Family," and contained the same signature block with the same text, font and warning about confidential material as those contained in an email the Banker had previously sent to the defendant.   The email stated in its entirety:

> The statements did indeed come from our bank and we acknowledge there is an error in our system and that is why the statements do not match.

> Hope this is helpful.

The defendant admitted as part of her plea allocution that she sent this email in the guise of the bank officer.

### 3.   Defrauding Second Mortgagee

After being advised by a potential lender that the second mortgage on the restaurant's property reduced the restaurant's creditworthiness, the defendant resorted to fraud to eliminate it.

The restaurant had borrowed $155,000 from L&J Smith, a partnership managed by a relative of the defendant's husband, in April 2014.   The loan was secured by a second mortgage

5

on the restaurant's property.   The defendant signed the mortgage and submitted it to the

Westchester County Clerk via the Internet for filing in the Clerk's public property records.

To eliminate the mortgage, the defendant created a false satisfaction of mortgage stating

that the $155,000 loan had been paid and that L&J Smith's mortgage on the Meyzen Family

Realty property should be discharged.   The defendant forged the signature of L&J Smith's

managing partner, falsified a notary's stamp and forged the notary's signature on the document.

She then filed the fabricated document via the Internet with the Clerk, and paid the filing fee by

check, on November 19, 2015.   The Clerk's Office initially rejected the satisfaction of mortgage

for formatting reasons.   The defendant resubmitted a revised document two years later, which

was then accepted and filed.   Thereafter, it appeared from the Clerk's public property records

that the Meyzen Family Realty property had only one mortgage on it.

The defendant was in no rush to resubmit the satisfaction of mortgage after the Clerk

initially rejected it in 2015 because she had accomplished her immediate purpose simply by

submitting it for filing.   She gave a copy of the forged document to the lender from which she

had been seeking credit on the same day she initially filed it with the Clerk.   She submitted it

again to the same lender two weeks later, accompanied this time by a cover sheet suggesting that

the release had been filed with the Clerk.

4.   Falsely Accusing Another of Fraud

The defendant falsely accused an innocent person of filing the forged satisfaction of

mortgage with the Clerk.   The FBI interviewed the defendant in May 2019, more than one year

after L&J Smith filed its lawsuit to have its second mortgage restored.   The defendant told the

FBI that she was aware of the fake satisfaction of mortgage and falsely claimed a representative

of a lender from which the restaurant had previously obtained a loan -- whom she identified by

name -- was responsible for filing it with the Clerk.   She falsely denied paying the filing fee or filing the document herself.

The agents initially advised the defendant that making false statements during the interview would be a federal crime that could subject her to imprisonment.   At the end of the interview, the agents advised the defendant that she could change any statement she had made during the interview at that time without penalty.   The defendant declined to change anything she had said.

    5. <u>Defrauding Restaurant Customers</u>

The defendant defrauded two customers of the restaurant by charging restaurant expenses to their American Express cards more than 85 times.

    a. <u>Jane Doe</u>

The first victim, Jane Doe, is a senior citizen from Stamford, Connecticut.   She was a regular customer at the restaurant and had a personal friendship with the defendant.   Ms. Doe left her American Express card number on file in the restaurant with the understanding that the restaurant would automatically charge her restaurant bills to her account.

From June 2017 to October 2017, the defendant charged more than $83,000 for food, supplies and services in more than forty separate instances to Doe's account without Doe's knowledge or consent.   Many of these charges originated from vendors who demanded payment up front before it delivered any products or provided any services.

The defendant told Ms. Doe that the charges were a mistake and that she would call American Express to resolve the problem.   She thereafter told Ms. Doe repeatedly either that the matter was resolved or that American Express was still reviewing the matter.   The defendant also gave Ms. Doe checks drawn on the restaurant's checking account to cover approximately

$32,000 of the unauthorized charges.   These checks were returned due to insufficient funds.

                b.     <u>John Roe</u>

John Roe was a high-profile businessman who was also a restaurant customer.   In May through July 2019, the defendant charged more than $65,000 in food and services for the restaurant, as well as private nursing expenses, in more than 45 separate instances to Roe's account without Roe's knowledge or consent.   Some of these charges originated from vendors who demanded payment up front before they provided any services.

            6.     Obstructing the Bankruptcy:
                   <u>Concealing Property of the Debtor</u>

Once the defendant filed a Chapter 11 bankruptcy petition on behalf of the restaurant in April 2019, the restaurant's assets, including the proceeds from its operations, became the property of the bankruptcy estate.   While the restaurant (and thereby the defendant) maintained control of its assets as a debtor in possession, the management and disposition of the assets was subject to the approval of Bankruptcy Judge Drain, with input from the restaurant's creditors.

Two days after she filed the petition with the assistance of bankruptcy counsel, the defendant opened a bank account in her name at a bank in Ridgefield, Connecticut.   She then caused the restaurant's credit card receipts to be deposited into this account from which she paid restaurant expenses, as well as $5,000 in private nursing expenses.   The account was closed by the bank on or about May 1, 2019.

That did not stop the defendant.   Six days later, the defendant opened a business checking account at a bank in White Plains in the name of Honey Bee Farm, the name of a small apiary at her home that supplied honey to the restaurant at no expense.   The defendant then arranged to have the restaurant's credit card proceeds, as well as two advances on those proceeds

of $10,000 each, deposited into the Honey Bee Farm account.   The defendant used some of the proceeds to pay restaurant expenses, as well as personal expenses such as private nursing costs, veterinarian bills and car repair bills.

The defendant diverted a total of $313,077 from the bankruptcy estate.

> 7.   Obstructing the Bankruptcy:
>       <u>False Testimony to the United States Trustee</u>

The defendant gave false testimony under oath to the United States Trustee's Office when she was deposed as part of the La Cremaillere restaurant bankruptcy on June 11, 2019.

On November 7, 2018, the United States Trustee took testimony from the defendant in connection with the related Meyzen Family Realty bankruptcy.   During the deposition, bankruptcy counsel for Meyzen Family Realty disclosed that there was no property insurance in effect on the restaurant property.   The Assistant United States Trustee responded in part:

> This is obviously a big issue for my office and for creditors as well.   If insurance isn't in place promptly, we'll likely move to dismiss your case.

The defendant responded "right," and said that she had spoken with her insurance broker that morning, intended to meet with him later that day and intended to get property insurance in place that day.   The Assistant United States Trustee responded in part "It's a big issue, so I see that you understand that."   The defendant responded "I do understand that."   The defendant therefore knew that the lack of insurance on the property was a material issue for creditors and for the United States Trustee.

The Bankruptcy Court held a hearing in the La Cremaillere bankruptcy on May 15, 2019. Prior to that hearing, an Assistant United States Trustee and counsel for Meyzen Family Realty's largest creditor asked bankruptcy counsel for Meyzen Family Realty and La Cremaillere whether either debtor had obtained insurance.   On May 14, 2019, a paralegal from bankruptcy counsel's

office sent an email to the United States Trustee's office in which she stated in substance and in part that "The Debtor is suppose [sic] to be supplying those . . . this morning before the conference."   In a later email on or about that day, the paralegal attached documents indicating that La Cremaillere and Meyzen Family Realty had property insurance and liability insurance in effect as of November 30, 2018.   The United States Trustee's office learned the next day, immediately before the May 15 hearing, that both the liability insurance and the property insurance had been cancelled in or about February 2019 due to nonpayment.

The United States Trustee's office deposed the defendant in connection with the La Cremaillere bankruptcy on June 11, 2019.   When asked about the cancellation of the insurance policies, the defendant falsely testified that she had not received any notice of the cancellation of the policies and, therefore, "did not realize that the policy had been canceled" at the time she had caused the insurance documents to be given to the U.S. Trustee on May 14.

The defendant knew as of November 2018 that the policies were canceled at that time. The insurance company sent her written notices relating to the cancellation and employees of the restaurant's insurance broker spoke directly with her about the cancellation on several occasions.

8.   Attempt to Obstruct the Investigation:
     False Statements to the FBI

As noted above, the defendant was interviewed by the FBI on May 1, 2019.   In addition to falsely blaming an employee of one of the restaurant's lenders for filing the false satisfaction of mortgage, the defendant made the following false statements:

a.   she did not know anything about charges made to Jane Doe's charge card account for restaurant supplies for La Cremaillere;

b.   she did not have conversations with Jane Doe about charges to Jane Doe's

10

charge card account;

      c.  she did not give Jane Doe checks, which bounced, to cover the charges;

      d.  she did not know anything about submitting altered bank statements to lenders; and

      e.  she did not send a fake email to a lender.

As noted above, the agents gave the defendant an opportunity to change any statement she had made without penalty but the defendant declined to do so.

## II.    Calculation of the Offense Level

The parties have stipulated in the plea agreement that the defendant's offense level is 28. That level was calculated using a loss between $1.5 million and $3.5 million; increases that recognized the offenses involved ten or more victims, a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding, and sophisticated means; an increase that recognized that the defendant attempted to obstruct justice; and a reduction that recognized the defendant's acceptance of responsibility.   Since the defendant has no relevant criminal history, her offense level results in a Guidelines range of 78 to 97 months' imprisonment and a fine range of $25,000 to $250,000.

### A.    Calculation of the Loss

The calculation of the total loss figure of $2,697,056 of intended loss is set forth below.

#### 1.    Lender Losses

The total intended loss from fraudulent loan applications is $2,080,000.   The defendant received a total of $328,000 from those applications, from which $44,000 is still outstanding, all as described below.

11

| Lender | Application Date | Loss |
|--------|------------------|------|
| BofI Federal Bank | October 21, 2015 | $300,000 intended; no loan made |
| World Business Lenders | October 2015 | $300,000 intended; no loan made |
| PIRS | December 23, 2015 | $300,000 intended; loan made for $43,000, paid in full |
| Smarter Merchant | July 19, 2016 | Loan made for $70,000; paid in full |
| Jet | July 19, 2016 | Loan made for $50,000; paid in full |
| Rapid | July 21, 2016 | $500,000 intended |
| Ikahn | August 12, 2006 | Loan made for $60,000; $44,000 outstanding and past due |
| Rapid | January 2017 | $250,000 intended |
| Yellowstone | February 14, 2018 | $250,000 intended; loan made for $105,000, paid in full |

### 2.    Credit Card Losses

The defendant made $83,036 in fraudulent charges on Jane Doe's American Express card and $65,943 in fraudulent charges on John Roe's American Express card, for a total of $148,979.

### 3.    Mortgage Elimination Fraud

The intended loss from the mortgage elimination fraud is $155,000.   Although its second mortgage was restored, L&J Smith incurred legal fees arising from a lawsuit it was forced to file against the defendant to have its mortgage restored.

### 4.    Diversion from Bankruptcy Estate

The defendant diverted a total of $313,077 in restaurant proceeds belonging to the bankruptcy estate to her personal account and to the Honey Bee Farm account, for an intended loss in that amount.   The Government identified $176,643.65 in payments made from those proceeds that benefitted the restaurant, leaving $136,433.35 unaccounted for.

B.    Other Enhancements

1.    Ten or More Victims

The victims of the defendant's fraud scheme included the eight lenders identified above; L&J Smith; the bankruptcy estate of La Cremaillere Restaurant Corp.; the creditors of that estate; Jane Doe and John Roe; and American Express.

2.    Misrepresentation in Bankruptcy Proceeding

The two level enhancement in Section 2B1.1(b)(9)(B) has been applied to reflect the defendant's false testimony to the United States Trustee that she was unaware the property insurance had been canceled; her misleading the United States Trustee and the estate's largest creditor by providing them with documents falsely suggesting the property was insured; and her diversion of the restaurant's credit card proceeds, which belonged to the estate, into her personal account and later the Honey Bee Farm account.

3.    Sophisticated Means

The enhancement for sophisticated means under Section 2B1.1(b)(10)(C) applies because the defendant's complex and extended scheme involved numerous repetitive steps and the use of falsified documents over a period of years.

Sophisticated means "targets conduct that is more complex, demonstrates greater intricacy, or demonstrates greater planning than a routine [criminal offense of the same variety]." United States v. Lewis, 93 F.3d 1075, 1081 (2d Cir. 1996).   Here, the defendant carried out a multi-faceted scheme over a period of four years, all of which were designed to maintain her control over the otherwise failing restaurant.   The scheme involved fabricated bank statements, the fake email, the fabricated satisfaction of mortgage, more than 85 fraudulent American Express charges, the diversion of estate assets to two bank accounts, the misleading insurance

13

documents, the false testimony and the false statements to the FBI.   Given the complexity, scope and duration of this scheme, it qualifies as sophisticated almost by definition.   There is no routine criminal offense of this variety.

The defendant's scheme has many of the hallmarks of sophistication identified by the Second Circuit.   To carry out the scheme, the defendant repeatedly resorted to the fabrication and use of false documents, including the altered bank statements she gave to lenders, the creation and submission of the fake email to one lender and the fake satisfaction of mortgage. The creation and use of false documentation often constitutes "sophisticated means."   See United States v. Valente, 688 Fed.Appx. 76, 80 (2d Cir. 2017)(fabrication of false documents relating to status of funds taken from victims constituted sophisticated means); United States v. Stitsky, 536 Fed.Appx. 98, 112 (2d Cir. 2013)(creation and dissemination of marketing materials containing material misrepresentations factor that led to application of sophisticated means enhancement); United States v. Regensberg, 381 Fed.Appx. 60, 62 (2d Cir. 2010)(creation of fake loan documents and fraudulent earnings statements).

The scheme also involved numerous repetitive steps, including the repeated creation of false bank statements, the submission of those false statements to eight different lenders, and more than 85 fraudulent charges to two American Express cards.   Where a defendant's scheme involves various or repeated steps, the enhancement may apply "even if each step in the scheme was not elaborate."   United States v. Fofanah, 765 F.3D 141, 146 (2d Cir. 2014)("repetitive and coordinated nature" of conduct indicative of sophisticated means); Lewis, 93 F.3d at 1083 ("Even if each step in the [scheme] was simple, when viewed together, the steps comprised a plan more complex than merely filling out a false tax return").

The scheme also lasted for four years.   That extended duration can also be indicative of

14

sophisticated means.   <u>Stitsky</u>, 536 Fed.Appx. at 112 (applying enhancement where scheme lasted several years); <u>Regensberg</u>, 381 Fed.Appx. at 62 (applying sophisticated means enhancement where Ponzi scheme lasted for three years).

4.   <u>Attempted Obstruction of Investigation</u>

Application Note 8(E)(ii) to Section 2B1.1 of the Guidelines provides that if the two level enhancement in Section 2B1.1(b)(9)(B) for a misrepresentation or other fraudulent action in the course of a bankruptcy proceeding is applied, the two level enhancement for obstruction of justice should not also be applied for the same conduct.   Here, however, the Section 3C1.1 enhancement applies to different conduct than that described above in connection with the Section 2B1.1(b)(9)(B) enhancement.

The two level enhancement under Section 3C1.1 reflects the defendant's attempt to obstruct and impede the FBI's investigation of the false satisfaction of mortgage by knowingly and falsely blaming another for that conduct.   While the Government never believed the defendant's false accusation, the enhancement still applies based on the defendant's attempt to steer the direction away from her by causing the agents to start investigating another, innocent person.   In <u>United States v. Dreizler</u>, 78 Fed.Appx. 734 (2d Cir. 2003), the Court of Appeals affirmed Judge Brieant's imposition of the Section 3C1.1 enhancement where the defendant falsely accused two other individuals.   <u>Id</u>. at **2-3.   The Court rejected the defendant's argument that his fabrications did not constitute obstruction because law enforcement did not expend much time following the leads suggested by the defendant because "there was clearly an attempt to obstruct justice and likely an actual obstruction."   <u>Id</u>. at **3; <u>see</u> <u>United States v. Echevarria</u>, 33 F.3d 175, 179 (2d Cir. 1994)("whether Echevarria's statements were ultimately unconvincing is irrelevant to the applicability of § 3C1.1" because that enhancement "expressly

15

applies to attempts to obstruct justice").

III.     Application of the Relevant Section 3553(a) Factors

An analysis of the relevant Section 3553(a) factors, particularly the unique nature of the offense and the need for general deterrence, shows that a Guidelines sentence is warranted in this case.

A.     The Nature and Circumstances of the Offense

The broad scope of the defendant's scheme is quite unique when compared to that of other white collar cases.   The scheme here encompasses several fraudulent acts, as well as several obstructive acts, each of which were serious crimes standing alone.   The defendant worked hard, over a period of four years, to carry out her scheme.   She committed more than one hundred separate crimes, including at least 85 false American Express charges; 8 fraudulent loan applications; 1 false email; 2 submissions of the false satisfaction of mortgage; 2 diversions of estate proceeds; 1 instance of false testimony and 1 effort to mislead the United States Trustee with the insurance documents.   The scheme was hardly aberrant or a lapse in judgment.   Each of the defendant's numerous and, at times, repetitive acts over the four years was an opportunity for her to reconsider the wisdom of what she was doing and stop the scheme.   She never did stop it; instead, the Government had to.   The defendant is, therefore, much more culpable than many other defendants in fraud cases, who usually do not engage in so many separate serious criminal acts over such a long period of time.

The defendant did not stop her scheme because she did not want to.   As the person most familiar with the restaurant's finances and after more than five years of financial troubles for the restaurant, she had to know that the restaurant was no longer financially sustainable. Defrauding others was therefore the only way to delay what was, absent an unforeseen miracle,

16

the defendant's inevitable loss of her and her husband's business.   Contrary to the defendant's claim, therefore, she was essentially driven by personal greed.   She and her husband were the only ones who could have profited from her scheme.

Another unique characteristic of the defendant's scheme is its sheer brazenness.   The defendant's actions show that she would have stopped at nothing in terms of fraud and obstruction to keep control of the restaurant.   Other white collar defendants have lied on credit applications but very few have posed as bank officers to vouch for the accuracy of their lies. Forgery is not uncommon but filing a forged document with a county clerk -- twice -- to eliminate a mortgage, especially one held by a relative, is unusual.   Cheating one's customers is bad enough, but doing it more than 85 times and then giving one of the customers bad checks supposedly to cover the loss takes the fraud to a new level.   Subverting the process of the Bankruptcy Court through diversions of assets, false testimony and misleading documents takes gall that relatively few can muster.   All of that together makes the defendant more culpable, and more deserving of punishment, than the majority of white collar defendants.

But the defendant's chutzpah did not stop there.   As legally and morally reprehensible as everything else was, the single worst thing the defendant did was falsely accuse the lender's employee of a crime she had committed herself to the FBI in an effort to deflect attention from her own criminal activity.   Fortunately, the Government knew enough about the false satisfaction of mortgage to identify the defendant's accusation as false when she made it and no harm was done.   The defendant had no way of knowing that at the time, though, and the circumstances could easily have been quite different.   The FBI could easily have followed up on the defendant's accusation and questioned the lender's employee.   The employee could easily have been forced to bear the expense of retaining counsel, to run the risk of telling his employer

that he was under investigation, to suffer the loss of reputation that can arise from nothing more than an investigation and to bear sleepless nights wondering why he was the subject of an FBI investigation when he sincerely believed he had done nothing wrong.   Any adult would understand those risks but, to the defendant, the need to to try to protect herself outweighed the potential harm to another.

Due to the broad scope and duration of her scheme, the defendant also left numerous victims or potential victims in her wake.   The victim of the false accusation is the most notable potential victim.   The eight lenders, L&J Smith, American Express and the creditors in the bankruptcy suffered financial losses or the risk of financial loss.   Some of the vendors whom the defendant paid through fraudulent American Express charges suffered financial losses.   The bank officer and the notary on the satisfaction of mortgage were victims when the defendant stole their identities to carry out her scheme.   Jane Doe and John Roe suffered the potential for loss and the inconvenience of dealing with tens of thousands of dollars of fraudulent charges. Jane Roe paid part of the fraudulent charges and had to retain counsel when American Express threatened to sue her.   The Bankruptcy Court and the United States Trustee were victims because the defendant subverted their process; in a sense, the public is the victim of that subversion.   The FBI was also a potential victim, as the defendant took the risk that it would not only expend resources unnecessarily to follow up on her false accusation but would also commit what it would consider the serious error of accusing an innocent person.   The number of victims and the breadth of the harm and potential harm from the defendant's scheme also makes this case unique.

B.    <u>History and Characteristics of the Defendant</u>

While the defendant has no relevant criminal history, her conduct here over a period of

18

four years as described above is quite indicative of her character.   It is not likely that anyone who would falsely accuse another of criminal activity to federal agents, repeatedly subvert a federal court's process, lie to so many victims and engage in all the other conduct described above would take any sentence short of incarceration very seriously or be deterred from future criminal conduct.   The defendant has shown through her conduct that she has no respect for the law.

There is no support for the defendant's repeated argument that her crimes were "the product of . . . serious psychological problems," Def. Br. at 2; that "[h]er severe depression hid the truth from her," id., that she was "suffering from major depression that seriously affected her judgment and ability to appreciate the significance of her conduct," id. at 3; or that she committed her fraud "through the fog of her depression."   Id. at 15.   Contrary to the defendant's assertion, Dr. Krueger, a psychiatrist retained by the defense, never made any causal connection in his report between his diagnosis of depression and the defendant's conduct.   Instead, Dr. Krueger made the factual observation that "[w]hile she was struggling to keep the restaurant solvent, [the defendant] became progressively depressed and, in this context, engaged in various financial crimes."   Def. Br., App. A at 9.   He concluded only that the defendant "currently is depressed which has been associated with her arrest and legal situation."   Def. Br. App. A at 5. He made no claim that depression caused, contributed to, or explained the defendant's conduct. Nor could he.   The Diagnostic and Statistical Manual of Mental Disorders does not identify impaired judgment or impulsive or manic behavior (other than suicidal ideation) among its diagnostic criteria for major depressive disorder.   American Psychiatric Association, Depressive Disorders, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed.)(2013).   The criteria do include indecisiveness and fatigue, neither of which were remotely apparent in the defendant's

19

energetic, multi-year and multi-faceted scheme.   The defendant may be suffering from depression - hardly unique among criminal defendants facing potential prison sentences - but that diagnosis does not mitigate her criminal conduct.

The defendant also offers no support for her argument that her relatively small size justifies a more lenient sentence.   She offers no evidence that female inmates of relatively small stature are likely to be victims of physical attacks in facilities managed by the Bureau of Prisons. Instead, she only points to United States v. Lara, 905 F.2d 599 (2d Cir. 1990), in which the Court of Appeals affirmed Judge Glasser's downward departure based on his findings that the 22 year old male defendant was "peculiarly vulnerable" to attack in prison because he looked to be 16 years old, was bisexual, was "delicate looking," was "someone who for whatever reason has the mannerisms that he has," and had already been the victim of an attempt to coerce him into prostitution.   None of those factors are present here and there is no evidence that this defendant would be "peculiarly vulnerable" to attack in a federal facility.

C.      Deterrence and the Need for the
        Sentence to Promote Respect for the Law

A Guideline sentence is needed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."   18 U.S.C. § 3553(a)(2)(A). For the reasons set forth above, the defendant's crime was uniquely serious due to its breadth, its brazen nature and the magnitude and scope of potential harm it posed.

Three aspects of the defendant's crime compel a Guidelines sentence "to afford adequate deterrence to criminal conduct" by others.   18 U.S.C. § 3553(a)(2)(B).   The first, and most serious, is the false accusation by the defendant that the employee of the lender filed the false satisfaction of mortgage.   The need to send a message to deter others from similar conduct is

readily apparent.

The second is the defendant's multiple efforts to subvert the bankruptcy process.   The bankruptcy process, particularly a Chapter 11 with a debtor in possession, relies in large part on the debtor being forthright about its finances because much of a debtor's financial information is uniquely in its possession.   The Bankruptcy Court needs that financial information to make decisions while the creditors also need it to exercise their right of having input into those decisions.   Neither the Bankruptcy Court nor creditors have the ability or resources in most cases to exercise the equivalent of search warrants.   Bankruptcy Judges in this District certainly do not have the time or resources to monitor debtors before them as closely as this defendant needed to be monitored.   The District's ten Bankruptcy Judges deal with approximately 9,000 pending cases a year.   *Table F.   U.S. Bankruptcy Courts - Bankruptcy Cases Commenced, Terminated and Pending,* Statistics & Reports, United States Courts, uscourts.gov/statistics/table /f/bankruptcy-filings/2019/12/31 (last visited August 28, 2020).   Realistically, the only way the court or the creditors can get the information they need in most cases is for the debtor to be truthful and forthright.   Any efforts to subvert that process, especially by hiding assets or giving false testimony as the defendant did, should be taken seriously to deter others.

Similarly, there is a need to deter others from making false filings in the property records of the Westchester County Clerk, as the defendant did.   Lenders rely on those records to calculate how much equity a borrower has in a specific property and to make lending decisions. Homeowners rely on those records to protect their ownership interest in what is for many their largest investment.   The public generally relies on those records to ensure an orderly real estate market.   For those reasons, it is imperative not only that a county clerk's property records be accurate but that the public perceives those records as reliable.

21

D.    Need to Avoid Unwarranted
      Sentencing Disparities

The defendant's citation to United States v. Harris, 349 F.Supp.3d 221 (E.D.N.Y. 2018) is

unavailing.   In that case, Judge Weinstein sentenced a former New York State Assemblywoman

to 6 months based on circumstances not present here.   In Harris, the defendant had been a victim

of parental beatings in childhood that caused her to drop out of high school and leave the family

home.   The unexpected death of her child was followed by a period in which the defendant was

a crack addict and a prostitute.   She was diagnosed with breast cancer and underwent a

mastectomy and three reconstructive surgeries.   She was the victim of a car accident that led to

multiple surgeries.   She suffered from diabetes and other medical problems.   Nevertheless, the

defendant overcame these problems, earned her GED and, later, a master's degree, became a

correctional officer and later was elected to the Assembly.   Judge Weinstein found that the

defendant had exhibited a "remarkable capacity" to rehabilitate herself and was likely to be in

danger in prison due to her former employment as a prison guard.   Id. at 223.   These factors are

not present here to anywhere near the same degree as they were in Harris.   Further, citations to a

single case or a small group of carefully chosen cases to advocate for a particular sentence are

not likely to be helpful to a sentencing court.   The Government could just as easily cite one or

more of its cherry picked cases to advocate for a sentence it would prefer.   That effort, however,

would ignore the fact that no two cases, and no two defendants, are alike, which renders citations

to one case or a small number of cases largely meaningless.   The requirement that a sentencing

court avoid unwarranted sentencing disparities "does not require a district court to conform its

sentence to any single other sentence adduced by a defendant."   United States v. Halloran, 821

F.3d 321, 341 (2d Cir. 2016).   Instead, the "primary purpose" of that subsection of Section

3553(a) is "'to reduce unwarranted sentencing disparities' on a <u>nationwide</u> level."   <u>United States</u>

<u>v. Sampson</u>, 898 F.3d 287, 314 (2d Cir. 2018)(emphasis in original), <u>quoting</u> <u>United States v.</u>

<u>Wills</u>, 476 F.3d 103, 109 (2d Cir. 2007).   Finally, one would have to assume that the result in

<u>Harris</u> was the right one for it to have any precedential value at all.   Many would argue that an

elected official who repeatedly embezzled from charities and a government agency and

obstructed justice should have received a greater sentence despite the difficulties in her personal

life.

IV.   <u>Restitution and Forfeiture</u>

The defendant should forfeit $320,289.35 and pay that amount in restitution as well.[1]

That amount was calculated as follows:

| | |
|---|---|
| Bankruptcy Estate of La Cremaillere Restaurant Corp. | $136,433.35 |
| American Express (for Jane Doe) | $ 83,036 |
| American Express (for John Roe) | $ 56,820 |
| Ikahn | $ 44,000 |

Accordingly, the Government seeks a restitution order and a Consent Preliminary Order

of Forfeiture/Money Judgment in accordance with the above.

---

[1] In calculating the amount due to the bankruptcy estate of La Cremaillere, the Government had initially subtracted $53,333 paid from the diverted restaurant proceeds that clearly went to pay expenses arising from the operation of the restaurant.   That credit led to the stipulated forfeiture and restitution figure in the plea agreement of $443,600. Since that time, the parties have identified an additional $123,310.65 that the defendant paid from the diverted proceeds in salary expense on behalf of the restaurant.   Accordingly, that amount has been subtracted out as well.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court

sentence the defendant within the applicable Guideline range.

Dated:   White Plains, New York
         September 16, 2020

                                        Respectfully submitted,

                                        AUDREY STRAUSS
                                        Acting United States Attorney

                                              /s

                        By:     _____
                                James McMahon
                                Assistant United States Attorney
                                (914) 993-1936

cc:   James DeVita, Esq.
         (by ECF)

24